UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

FILE NO.

| | |
|---|---|
| DAVID BOWEN : | |
|     Plaintiff, : | |
| : | |
| : | |
| : | **COMPLAINT** |
| TYSON FARMS, INC.; THE HILLSHIRE : | |
| BRANDS COMPANY; and TYSON : | (Jury Trial Requested) |
| FOODS, INC. : | |
|     Defendants. : | |

COMES NOW the Plaintiff, DAVID BOWEN (hereinafter "Plaintiff"), by and through his undersigned attorney, and hereby files this Complaint for damages and other legal and equitable relief from Defendants, TYSON FARMS, INC., THE HILLSHIRE BRANDS COMPANY, and TYSON FOODS, INC. (collectively "Defendants") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*

## NATURE OF THE CASE

1. This is an action brought by Plaintiff seeking damages and other equitable relief for discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, and state law, including Wrongful Discharge, Intentional Infliction of Emotional Distress, and Negligent Infliction of Emotional Distress.

## JURISDICTION & VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original

jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.*, as amended, and (iii) 42 U.S.C. §§ 1981 *et seq.*, as amended.

2. The Court's supplemental jurisdiction is invoked by 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this Court in as much as the unlawful employment practices occurred in this judicial district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendant maintains offices and conducts business in this district.

## PARTIES

2. Plaintiff, an African American male, is and was, at all times relevant to this action, a resident of North Carolina.

3. At all times relevant, Plaintiff was employed by Tyson Farms Inc. at the Monroe Processing Plant, located at 233 S. Secrest Ave, Monroe, North Carolina 28112.

4. Upon information and belief, Defendant Tyson Farms, Inc. (hereinafter "Defendant Farms") is a domestic corporation operating under the laws of the State of North Carolina and doing business in Monroe, Union County, North Carolina.

5. Defendant Farm's principal place of business is located at 2200 W Don Tyson Parkway, Springdale, AR 72762-6901, and its registered mailing address is 160 Mine Lake Ct Ste 200, Raleigh, NC 27615-6417.

6. Upon information and belief, Defendant Tyson Foods, Inc. (hereinafter "Defendant Foods") is the parent corporation of Tyson Farms, Inc.

7. Upon information and belief, Defendant Foods is a foreign corporation operating under the laws of the State of North Carolina, and doing business in Monroe, Union County, North Carolina.

8. Defendant Food's principal place of business is located at 2210 Oaklawn Drive, Springdale, AR 72765-2020.

9. Defendant The Hillshire Brands company (hereinafter "Defendant Hillshire") is a foreign corporation operating under the laws of the State of North Carolina and doing business in Monroe, Union County, North Carolina. Upon information and belief, Defendant Hillshire is a subsidiary of Defendant Foods.

10. Defendant Hillshire's principal place of business is located at 2405 York Road, Suite 201, Lutherville Timonium, MD 21093-2264.

11. Defendants are "persons" within the meaning of § 701 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

12. Defendants engage in an industry affecting commerce and, upon information and belief, employ over fifteen (15) persons. Thus, Defendants are "employers" within the meaning of § 701 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

**EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES**

13. Plaintiff has timely filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC").

14. On September 20, 2023, Plaintiff was mailed his Notice of Right to Sue from the EEOC.

## STATEMENT OF FACTS

15. On or about September 10, 2012, Plaintiff, an African American employee, began working for Defendants as an Animal Welfare Specialist at Defendant's Processing Plant located at 233 S. Secrest Ave, Monroe, North Carolina 28112.

16. Upon information and belief, at all relevant times, Defendants also employed a Senior Animal Welfare Manager, named Chris Lambert (hereinafter "C.L."), who supervised Plaintiff. C.L. began supervising Plaintiff in 2017.

17. Upon information and belief, C.L. is a White Caucasian male.

18. Throughout his time supervising Plaintiff, C.L. harassed and subjected Plaintiff to a hostile work environment by threatening Plaintiff's job, excluding Plaintiff from work meetings and other workplace activities, making racially charged statements to Plaintiff, and publicly discrediting Plaintiff, to be more particularly described herein.

19. On or around May 18, 2019, Plaintiff played a piano in the presence of C.L. and Plaintiff's colleague Sinclair Buntin (hereinafter "S.B."). Upon hearing Plaintiff play the piano, C.L. made the comment "Good, at least I know if I ever had to fire you, you can get a job playing the piano."

20. After the incident on or around May 18, 2019, Plaintiff felt that his job had been threatened due to C.L.'s assertion that he had the power to fire Plaintiff and his flippant attitude towards Plaintiff's employment. Furthermore, Plaintiff felt embarrassed and disrespected, particularly because C.L. mocked Plaintiff in front of Plaintiff's colleague.

21. On numerous occasions, Plaintiff was deliberately left out of meetings and outcasted from coworkers and work-place activities. Upon information and belief, Plaintiff was the only

African American employee in his team and was the only employee excluded from meetings and work-place activities.

22. On or around October 31, 2022, Plaintiff was required to attend the annual Animal Welfare Summit (hereinafter "Summit") in Arkansas. Upon information and belief, it was customary for supervisors to contact employees and check in once employees had arrived at the Summit. C.L. contacted Plaintiff's colleagues to check in, make dinner plans, and hold team-building activities. C.L. failed to contact Plaintiff, and thus, intentionally excluded Plaintiff from said plans and activities.

23. On or around November 3, 2022, during the Summit, Defendants' employees were required to participate in work events and contribute to group projects. As a part of this requirement, approximately thirty-two (32) employees, including Plaintiff, gave presentations (hereinafter "Summit Presentations") to other employees during the Summit.

24. On or around November 3, 2022, after Plaintiff's Summit Presentation, C.L. publicly discredited Plaintiff by stating the following in front of Plaintiff and to Plaintiff's colleagues: "David [Plaintiff] got up there and ranted for over fifteen minutes."

25. Notably, the Summit Presentations are graded and ranked every year. Of the thirty-two (32) Summit Presentations presented in November of 2022, Plaintiff's was awarded second place. After Plaintiff had been awarded second place, C.L. did not go back to correct his prior characterization of Plaintiff's Summit Presentation as a "rant."

26. Due to Plaintiff's (1) exclusion from coworkers and work-related activities and (2) the specific events occurring in or around October and November of 2022, Plaintiff felt alienated, disrespected, embarrassed, emotionally hurt, and unwelcome in his work environment.

27. C.L.'s conduct escalated, further contributing to Plaintiff's harm, when C.L. made comments and jokes that indicated his negative feelings towards African American individuals.

28. On or around April 4, 2023, C.L. referenced a racially derogatory joke in the presence of Plaintiff and S.B., Plaintiff's colleague. Specifically, on this occasion, C.L. met with Plaintiff and S.B., and when all three men were in the same room, C.L. asked to close the door. Presumably, C.L.'s request was to ensure that no one else overheard C.L.'s inappropriate comments.

29. Once the door was closed, C.L. proceeded to show Plaintiff and S.B. a video that told a racially insensitive joke, particularly, that both the palms of Black people's hands and the soles of Black people's feet were white because that is the only place Black people put sunscreen.

30. This joke is derogatory as it insinuates that African Americans are "burnt" or otherwise inferior to those who are white. As such, it was wholly inappropriate for C.L. to reference it, particularly because (1) C.L. was Plaintiff's supervisor, (2) C.L. had taken prior hostile actions against Plaintiff, and (3) C.L. referenced this joke while they were in the work environment.

31. Moreover, after C.L. showed Plaintiff and S.B. the video on or around April 4, 2023, C.L. acknowledged the derogatory nature of the joke by stating the following: "Some people would think its racist, but I think it's funny. People just need to stop being so damn sensitive."

32. As a result of C.L.'s conduct, Plaintiff felt emotionally hurt, embarrassed, and disrespected.

33. Upon information and belief, C.L.'s joke and comment also made S.B. uncomfortable.

34. Plaintiff did not report C.L.'s conduct occurring on or around April 4, 2023, due to his fear of possible retaliation.

35. Specifically, Plaintiff had observed another employee report to C.L.'s manager regarding C.L.'s conduct towards her. Upon information and belief, no action was taken to reprimand C.L. or stop his conduct. As Plaintiff already felt singled out by C.L. and had already suffered from C.L.'s hostile and harassing behavior, Plaintiff did not want to paint a larger target on his back. Furthermore, upon information and belief, and as evidenced by C.L.'s statement on or around May 18, 2019, as described herein, C.L., as Plaintiff's supervisor, had the authority to terminate Plaintiff.

36. On or around April 27, 2023, Plaintiff received a 30-day notice of termination.

37. Plaintiff was informed that this termination was based on an alleged reduction in force. However, upon information and belief, Plaintiff's termination was based on discriminatory reasons.

38. Prior to the notice of termination, Plaintiff had been employed by Defendants for over ten (10) years. Plaintiff had worked in the Animal Welfare Department for approximately six (6) years. During that time, Plaintiff performed his job well, met performance goals, received positive work evaluations, and worked well with his colleagues.

39. Plaintiff was later informed that several regional positions were being created and that employees would have the choice to apply for those positions.

40. Plaintiff was also informed that interviews would *not* be held and that "the process was going to be swift and fast and that decisions would be made about the positions by Friday, May 5, 2023."

41. On or around April 28, 2023, Plaintiff applied for an auditor position at Defendants' Monroe, Wilkesboro, and New Holland facilities.

42. Plaintiff was well-qualified for this position as he had over ten (10) years of employment experience with Defendants and approximately six (6) years of experience working in the Animal Welfare Department, the same department in which the auditor position would be in. Moreover, Plaintiff has extensive education, including a Bachelor of Science degree in Animal Science and Master of Science degree in Agricultural Education.

43. Despite Plaintiff's qualifications, on or around May 5, 2023, C.L informed Plaintiff via a one minute and 14-second phone call that Plaintiff did not receive the auditor position. C.L. refused to provide Plaintiff with a reason as to why Plaintiff was not awarded the position.

44. Upon information and belief, another employee of Defendants, namely Brianna Shell (hereinafter "B.S."), was hired to fill the position that Plaintiff applied for.

45. Upon information and belief, B.S. is a white female.

46. Upon information and belief, B.S. was less qualified and had much less experience than Plaintiff. B.S. had been employed by Defendants for approximately five (5) years and had only worked in the Animal Welfare Departments for approximately one (1) year and four (4) months.

47. In addition, Plaintiff had substantially more seniority than B.S. Upon information and belief, Plaintiff is the only person in his department who lost a sought-out position to someone with less seniority.

48. Plaintiff contacted Human Resources personnel, Tyre Shoffner (hereinafter "T.S.") and Denise Baker (hereinafter "D.B.") to inquire as to why he did not receive the auditor position.

49. D.B. informed Plaintiff that there was a negative performance review in Plaintiff's file for the Fiscal Year 2016 Year-End Review and that this was factored into the consideration for the position.

50. Plaintiff was an exemplary employee and, upon information and belief, never received any negative performance reviews. At the very least, Plaintiff never received notification of any bad performance reviews. Moreover, Plaintiff was never placed on a Performance Improvement Plan (hereinafter "PIP") or any other corrective plan to remediate any alleged bad performance.

51. Notably, C.L. did not begin supervising Plaintiff until 2017. Thus, C.L. had no knowledge of Plaintiff's performance nor did C.L. provide performance reviews for Plaintiff during Fiscal Year 2015-2016 or Fiscal Year 2016-2017.

52. C.L. had previously informed Plaintiff that the new "Next Frontier System," which upon information and belief is the human resources data system used by Defendant, allowed him to do anything he wanted to without others noticing. C.L. even indicated that he could change someone's salary or pay rate if he wanted to.

53. Upon information and belief, C.L. retroactively altered several of Plaintiff's Fiscal Year performance reviews, including the Fiscal Year 2016 Year-End Review, and assigned Plaintiff a negative rating of "Inconsistent Performer."

54. Upon information and belief, Records indicate that C.L. made these changes on or about March 13, 2019, between 2:30 PM and 3:00 PM.

55. Upon information and belief, C.L. altered Plaintiff's performance reviews for discriminatory reasons as indicated by C.L.'s prior conduct and discriminatory comments.

9
Case 3:23-cv-00863-FDW-DCK    Document 1    Filed 12/17/23    Page 9 of 18

56. Upon information and belief, Plaintiff was improperly denied the auditor position due to C.L.'s alteration of Plaintiff's performance reviews. As such, Plaintiff was improperly denied a position for discriminatory reasons.

57. Upon information and belief, no minority employee from Defendant's original Animal Welfare Department was rehired into one of the new regional positions.

58. Upon information and belief, C.L. later attempted to persuade employees to go to the human resources department and tell them that C.L. was not a racist.

59. Plaintiff was ultimately terminated on or about May 27, 2023.

## FIRST CAUSE OF ACTION
### Violation of Title VII 42 U.S.C. § 2000e, et. seq.
### Racial Discrimination—Hostile Work Environment

60. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

61. A plaintiff is subjected to a racially hostile work environment in violation of Title VII when "there is (1) unwelcome conduct; (2) that is based on plaintiff's [. . .] race; (3) which is sufficiently severe *or* pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (2011) (emphasis added).

62. As an African American, Plaintiff belongs to a statutorily protected category.

63. Throughout Plaintiff's employment, Plaintiff's supervisor, C.L., subjected Plaintiff to unwelcome conduct, including intimidation, ridicule, insults, belittling comments, racially derogatory jokes, and the retroactive alteration of Plaintiff's performance reviews as more particularly described herein. In addition, C.L. singled Plaintiff out and excluded Plaintiff from coworkers and work-related activities.

64. C.L. subjected Plaintiff to said unwelcome conduct for several years, throughout the time in which C.L. supervised Plaintiff.

65. C.L.'s conduct was based on Plaintiff's race as evidenced by C.L.'s racially derogatory statements and C.L.'s repeated actions in singling out Plaintiff, the only African American working in his department team.

66. C.L.'s conduct was both sufficiently severe and sufficiently pervasive so as to alter the terms and conditions of Plaintiff's employment and to create an abusive work environment.

67. Plaintiff actually perceived his work environment to be intimidating, unwelcoming, offensive, and hostile.

68. Ultimately, C.L.'s conduct culminated to a tangible employment action, specifically Plaintiff's firing and Defendant's decision not to hire Plaintiff for the auditor position.

69. As C.L. was Plaintiff's supervisor and his conduct resulted in a tangible employment action, Defendant is strictly liable for C.L.'s harassing conduct. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

70. Furthermore, Defendant is also liable for C.L.'s conduct that may not have culminated to a tangible employment action, but nevertheless created an intimidating, unwelcoming, and hostile work environment.

71. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

**SECOND CAUSE OF ACTION**
**Violation of Title VII 42 U.S.C. § 2000e, et. seq.**
**Racial Discrimination—Disparate Treatment in Firing, Discharge, and/or Hiring**

72. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

73. A plaintiff may establish a prima facie case of disparate treatment in violation of Title VII by showing the following: (1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (2019).

74. As an African American, Plaintiff belongs to a statutorily protected category.

75. Plaintiff, was qualified for his job, as evidenced by his education and extensive work experience with Defendant. Additionally, Plaintiff, in all respects, was performing his job in a manner that was consistent with Defendant's legitimate business expectations.

76. Plaintiff suffered adverse employment action when he was terminated, when C.L. retroactively altered Plaintiff's performance reviews, and when Defendant failed to hire Plaintiff for the auditor position based on C.L.'s alteration of Plaintiff's performance reviews.

77. These adverse employment actions were taken with discriminatory intent as evidenced by C.L.'s comments and treatment of Plaintiff as described herein.

78. Plaintiff was treated differently from similarly situated employees outside of his protected class as Plaintiff was the only African American in his department team, Plaintiff was the only person in his department who lost a sought-out position to someone with less seniority, and a white female with less experience was hired for the auditor position instead of Plaintiff.

79. Further, no minority employee was hired into any newly offered regional position.

80. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

### THIRD CAUSE OF ACTION
### Violation of 42 U.S.C. § 1981
### Racial Discrimination—Hostile Work Environment & Disparate Treatment

81. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

82. A hostile work environment claim may be brought under 42 U.S.C. 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts [. . .] as is enjoyed by white citizens." *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).

83. The elements for a claim of hostile work environment are the same under § 1981 as they are under Title VII. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001).

84. Further, disparate treatment claims may be brought under § 1981, and the elements of a prima facie case of disparate treatment under § 1981 are the same as those for a Title VII claim. *See Gairola v. Virginia Dep't of General Services*, 753 F.2d 1281 (4th Cir. 1985).

85. As an African American, Plaintiff belongs to a statutorily protected category.

86. Plaintiff, was qualified for his job, as evidenced by his education and extensive work experience with Defendant. Additionally, Plaintiff, in all respects, was performing his job in a manner that was consistent with Defendant's legitimate business expectations.

87. C.L., Plaintiff's supervisor, discriminated against Plaintiff as previously described herein, including but not limited to harassing him, subjecting him to a hostile work environment, and ultimately causing Plaintiff to be both terminated and denied the auditor position.

88. These actions were taken with willful and wanton disregard of Plaintiff's rights under § 1981.

89. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

## FOURTH CAUSE OF ACTION
### Wrongful Discharge as Against Public Policy

90. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

91. Pursuant to N.C.G.S. § 143-422.2(a), it is the public policy of the State of North Carolina "to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees."

92. Defendant regularly employees more than fifteen employees.

93. As an African American, Plaintiff belongs to a statutorily protected category.

94. Plaintiff was subjected to discriminatory conduct and a hostile work environment as set forth herein.

95. Despite Plaintiff's job qualifications as previously described herein, Defendant ultimately terminated Plaintiff and refused to hire Plaintiff in another position for which Plaintiff applied.

96. This adverse employment action was taken based on discriminatory reasons as previously set forth herein. Moreover, Plaintiff was treated differently from similarly situated employees outside of his protected class as Plaintiff was the only African American in his

14
Case 3:23-cv-00863-FDW-DCK    Document 1    Filed 12/17/23    Page 14 of 18

department team and Plaintiff was the only person in his department who lost a sought-out position to someone with less seniority.

97. A white female with less experience was hired for the auditor position instead of Plaintiff.

98. The conduct alleged herein violates N.C.G.S. § 143-422.2(a).

99. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

## FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

100. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

101. To state a claim for intentional infliction of emotional distress, plaintiff must allege facts sufficient to show the following three elements: (1) extreme and outrageous conduct, (2) which is intended to cause or with reckless indifference to the likelihood that they will cause, (3) severe emotional distress to another. *Dickens v. Puryear*, 302 N.C. 437, 453 (1981).

102. C.L.'s acts of discrimination, including but not limited to, his racially derogatory comments, public insults, singling out of Plaintiff, and retroactive altering of Plaintiff's performance reviews were extreme and outrageous.

103. C.L. performed this conduct with intent to cause or with reckless indifference to the likelihood that it would cause Plaintiff's severe emotional distress, as evidenced by C.L.'s continued harassment of Plaintiff, knowingly derogatory comments, and conduct severely effecting Plaintiff's employment status and livelihood.

104. Plaintiff suffered severe emotional distress and mental anguish as result of the hostile work environment and adverse employment actions.

105. At all relevant times, C.L. was acting within the scope of his employment. Thus, Defendant is vicariously liable under the doctrine of *respondeat superior*.

106. As a direct and proximate result of the conduct described herein, Plaintiff has suffered and is entitled to recovery of damages to be determined at a trial of this matter.

### SIXTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**

107. Plaintiff re-alleges and re-incorporates the above paragraphs as if fully stated forth herein.

108. Under North Carolina state law, a cause of action for negligent infliction of emotional distress is established when the defendant negligently engaged in conduct in which it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and the conduct did in fact cause the plaintiff severe emotional distress. *Sorrells v. M.Y.B. Hospitality Ventures of Asheville*, 334 N.C. 669, 435 S.E.2d 320 (1993) (citing *Johnson v. Ruark Obstetrics and Gynecology Assocs.*, 327 N.C. 283, 395 S.E.2d 85 (1990)).

109. C.L., as a supervisor, had a duty to exercise reasonable care to avoid cause emotional distress to Plaintiff.

110. C.L.'s discriminatory conduct as alleged hereinabove breached his duty of care owed to Plaintiff.

111. C.L. could reasonably foresee that his conduct, including but not limited to, his continued harassment of Plaintiff, derogatory comments, and conduct severely effecting Plaintiff's employment status and livelihood would cause Plaintiff to suffer severe emotional distress.

112. Plaintiff suffered severe emotional distress as result of C.L.'s actions.

113. At all relevant times, C.L. was acting within the scope of his employment. Thus, Defendant his vicariously liable under the doctrine of *respondeat superior*.

114. As a direct and proximate result of the conduct described herein, Plaintiff has suffered and is entitled to recovery of damages to be determined at a trial of this matter.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendant as follows:

1. That the Court empanel a jury to hear his cause;

2. A judgment declaring that the practices complained of herein are unlawful and in violation of both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.;*

3. All damages which Plaintiff has sustained because of Defendant's conduct, including back pay, front pay, benefits, general and specific damages for lost compensation, and job benefits he would have received but for Defendant's unlawful employment practices, and for emotional distress, humiliation, embarrassment, and anguish;

4. Exemplary and punitive damages in an amount commensurate with Defendant's ability and to deter future malicious, reckless, and/or intentional conduct;

5. Award Plaintiff the costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs;

6. Pre-judgment and post-judgment interest, as provided by law;

7. That the Court retain jurisdiction over Defendant until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law; and

8. Granting Plaintiff other and further relief as this Court finds necessary and proper.

Plaintiff also seeks injunctive relief, including, but not limited to:

9. Training regarding the prohibition against retaliation for engaging in protected activity for all of Defendant's supervisors.

10. Training of all employees regarding hostile work environment, including the reporting procedures for reporting such retaliation, conducted by reputable outside vendors.

11. Supervisory discipline up to and including termination for any employee who engages in discrimination based upon race, including any employee who engages in discriminatory practices.

12. Monitoring by the Court or a federal agency to ensure that Defendant complies with all injunctive relief; and

13. Plaintiff further demands that he be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Respectfully submitted,

This the 17th day of December, 2023.

Burts Law, PLLC
*/s/ M. Anthony Burts II*
M. Anthony Burts II
Attorney for Plaintiff
PO Box 102
Newton, NC 28658
T. (704) 751-0455
F. (704) 413-3882
NCSB# 49878